# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>VENETIA TORRES,<br><br>　　　　　　　Defendant. | 8:23CR184<br><br>FINDINGS AND<br>RECOMMENDATION |

　　　　This matter is before the Court on the Motion to Suppress Evidence and Statements and Request for Hearing ([Filing No. 33](#)) filed by Defendant, Venetia Torres. Defendant filed a brief ([Filing No. 34](#)) in support of the motion and the government filed a brief ([Filing No. 56](#)) in opposition.

　　　　The Court held a pre-hearing status conference with counsel on December 19, 2023 (Filing No. 60), and held an evidentiary hearing on the motion on January 18, 2024. Defendant was present with her attorney, Richard McWilliams. The government was represented by Assistant United States Attorneys, Matt E. Lierman and Patrick McGee. The Court received into evidence, without objection, the government's Exhibit 1, which is the application for the search warrant executed in this matter. The Court also received Defendant's Exhibit 101, a photograph of the priority mail package searched pursuant to the search warrant, without objection. Derek Ryan ("PI Ryan"), a federal postal inspector, testified at the hearing. A transcript (TR.) of the hearing was prepared and filed on February 20, 2024. ([Filing No. 70](#)). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion to suppress be denied.

## BACKGROUND

　　　　On May 3, 2023, a United States Postal Services ("USPS") Priority Mail package ("Package 1") was mailed from Edison, California to 100 North Thatcher Street, Unit Number 11, Valentine, Nebraska (hereinafter, "the Valentine address"). (TR. 14, 25-26). USPS business records identified a partial Internet Protocol ("IP") address that tracked both Package 1 and another

USPS Priority package ("the Colorado Package").[1] The Colorado Package was mailed from Beaumont, California to Broomfield, Colorado. On May 9, 2023, U.S. Postal Inspection Service Task Force Officer Guida III searched the Colorado Package pursuant to a federal search warrant in the District of Colorado, recovering over a kilogram of counterfeit pills suspected of containing fentanyl or synthetic opioid. (TR. 13).

Following the execution of the search warrant on the Colorado Package, the Colorado postal inspectors informed PI Ryan,[2] a U.S. Postal Inspector stationed in the Omaha division, of the matching partial IP addresses between the Colorado Package and Package 1 addressed to the Valentine address. (TR. 8, 19-20). PI Ryan began investigating Package 1. PI Ryan testified he has been trained to look for a variety of factors or indicators regarding whether a mail package may contain contraband or narcotics, including: (1) whether the location of where the package was mailed from is considered a source location for narcotics; (2) how the postage for the package was paid for; (3) whether the address information is valid and associated with those individuals who live at the addresses; (4) whether the recipient address has received previous packages with narcotics; and (5) the size and shape package. (TR. 10-12).

PI Ryan testified he suspected Package 1 contained drugs because the same partial IP address had tracked the Colorado Package containing suspected fentanyl. This partial IP address was identified as a Sinaloa, Mexico-based IP, which PI Ryan testified was significant to him because "most of the drugs in the United States come from Mexico." PI Ryan testified Sinaloa specifically is "probably" the "biggest in the world" source of narcotics, and that groups in Mexico have workers in the United States who help move drugs across the border and within the United States. (TR. 18-20, 62, 75). Additionally, Package 1 was a USPS Priority Mail package, which PI Ryan testified is the most common way to transport narcotics through mail because of the real-time tracking of those packages. (TR. 23-24). PI Ryan was able to pull images of Package 1 through postal business records to obtain the sender's and recipient's information. (TR. 21). PI Ryan found that Package 1 was addressed to an individual named "Saul Morales," whom PI Ryan

---

[1] The partial IP address identified involved the same first four groups of the IPv6s which are assigned to use equipment by the network. PI Ryan testified the first four groups of the IPv6s are more accurate to help identify the subscriber since they are required and allows the identification of additional packages tracked by that user equipment. (TR. 17).

[2] PI Ryan has been a postal inspector for approximately ten years. Prior to that, he was a patrol officer with the Kansas City, Missouri, Police Department. (TR. 8-9).

found was not associated with the Valentine address through his search on Consolidated Lead Evaluation and Reporting ("CLEAR"), a law enforcement database that runs names, phone numbers, and addresses. (TR. 20-22). Additionally, PI Ryan discovered the sender's address was fictious; in other words, the sender's address did not exist. (TR. 25, 64). Moreover, Package 1 weighed two pounds thirteen ounces, which PI Ryan testified is a "heavier package than typically seen in business mailings for Priority Mail." (TR. 26). PI Ryan testified that based on his experience, these can be indicators that individuals are attempting to disassociate themselves from a package to frustrate law enforcement and conceal narcotics. (TR. 25). Following PI Ryan's investigation of Package 1, he implemented a "mail watch"[3] on the Valentine address. (TR. 27).

On June 6, 203, PI Ryan received a notification from the mail watch that a USPS Priority package ("the Subject Parcel") had been mailed from Bakersfield, California, a known source location for narcotics, to the Valentine address on June 5, 2023. (Ex. 1 at pp. 6-7). The postage for the Subject Parcel was paid in cash. The Subject Parcel was sent from a "Javier Ortiz" and contained a valid return address; however, PI Ryan searched CLEAR and did not find a "Javier Ortiz" was associated with the return address. The Subject Parcel was addressed to "[T.T.]";[4] PI Ryan's search of CLEAR did not reflect a "T.T." was associated with the Valentine address. (TR. 40-42). In addition, the Subject Parcel was a flat rate mailing box that weighed between five to six pounds, which PI Ryan testified is consistent with other packages that have contained illegal narcotics. (TR. 26-28, 30, 43).

Based on the information PI Ryan had learned about the Colorado Package and Package 1, PI Ryan suspected the Suspect Parcel may contain narcotics. PI Ryan contacted the Nebraska State Patrol ("NSP") in North Platte, Nebraska on June 6, 2023, regarding the circumstances surrounding the Subject Parcel, and arranged to travel to the mail processing facility in North Platte, Nebraska to locate and intercept the Subject Parcel for further investigation. (TR. 30-31).

On June 7, 2023, an officer from the Valentine Police Department interviewed a contract postal mail carrier with the Valentine post office as part of the investigation. The postal contractor

---

[3] PI Ryan testified that a "mail watch is a notification system where [law enforcement officers] can enter in an address that [they] suspect [is] receiving contraband whether it be illegal narcotics, stolen merchandise, whatever the case involves, and [law enforcement officers] receive an alert." A mail watch notification identifies the mailing location, type of package, weight of package, and destination address. (TR. 26, 28).

[4] The Subject Parcel actually included the full first and last name of "T.T."; however, the undersigned magistrate judge will redact T.T.'s name throughout because the individual is a minor.

3

described two encounters with a woman, later identified as Defendant, at the Valentine address. (TR. 31-35). The first encounter took place on May 25, 2023, when the postal contractor was delivering mail to the trailer park located at 100 North Thatcher Street in Valentine. The postal contractor was approached by the woman, who identified herself as "Little Sack," inquiring about a package to be delivered to the Valentine address (specifically, Unit 11). The postal contractor scanned the package ("Package 2") and hand delivered it to "Little Sack." (TR. 35, 39-40). The second encounter occurred on June 7, 2023, when the same woman approached the postal contractor at the same trailer park, and again inquired about a package addressed to the Valentine address (Unit 11). The woman stated her last name was "Torres." The postal contractor responded that no one was assigned to Unit 11's mailbox at the trailer park, and that Torres would have to fill out paperwork at the post office and pick up the package there. (TR. 32-35; Ex. 1 at p. 5). The Valentine Police Department officer showed the postal contractor two photographs of two different women. The postal contractor positively identified the photograph of Defendant, also known as "Ventia Little Sack," as the woman who had approached her on both occasions. (TR. 35). PI Ryan ran a criminal history check for Defendant, learning Defendant had a history of multiple prior arrests and convictions for felony drug offenses, including a felony possession of a controlled substance offense in 2005. (TR. 36).

PI Ryan then investigated Package 2, learning it weighed just over 4 pounds and was sent from a "Javier Medina" in Lamont, California[5] to a "Consuelo Mendoza" at the Valentine address. PI Ryan testified Package 2 contained a fictious return address, and he did not find anyone named "Consuelo Mendoza" associated with the Valentine address in CLEAR. (TR. 37-40). Based on those findings, PI Ryan testified he suspected Package 2 contained narcotics. (TR. 40).

In the early morning of June 8, 2023, PI Ryan arrived at the North Platte mail processing facility and located the Subject Parcel. (TR. 41). PI Ryan removed the Subject Parcel from the stream of mail at approximately 9 a.m. and transported it to the State Patrol Office in North Platte, Nebraska for a drug canine sniff. PI Ryan testified he did not open or otherwise manipulate the Subject Parcel. (TR. 44).

---

[5] Lamont and Bakersfield are both located in Kern County, California; PI Ryan testified he had previously seized a "handful" of packages from Kern County containing narcotics. (TR. 68).

At the State Patrol Office, NSP Trooper McKain deployed his drug canine[6] in a secluded room containing the Subject Parcel and three other similar packages to conduct a sniff; Trooper McKain advised his canine did not alert to the Subject Parcel. (TR. 45). Despite the canine's non-alert, PI Ryan testified he still believed the Subject Parcel contained narcotics based on his training and prior experiences; PI Ryan testified it was possible the person who had mailed the Subject Parcel had masked or effectively concealed the odor of the narcotic inside the package, or the package contained a drug the canine was not certified to detect. (TR. 45-47). PI Ryan continued to detain the Subject Parcel to obtain a search warrant.

PI Ryan prepared a search warrant affidavit containing the above information gathered from the investigation, including the information he learned about the partial IP addresses,[7] Colorado package, Package 1, Package 2, the Subject Parcel, the postal contractor's interactions with Defendant, Defendant's criminal history, and the negative result of the canine sniff. (Ex. 1 at pp. 4-8). United States Magistrate Judge Zwart authorized the requested search warrant for the Subject Parcel at 3:56 p.m. on June 8, 2023. (TR 47-48; Ex. 1 at p. 10).

Shortly thereafter, PI Ryan and NSP Investigator Phaby executed the search warrant of the Subject Parcel, finding two bundles wrapped in flash tape and surrounded by bubble wrap. Inside the bundles was approximately two kilograms of a crystal-like substance that field-tested positive for methamphetamine, which was subsequently confirmed by forensic lab testing. PI Ryan believed the flash tape wrapped around the bundles was an attempt to hide the odor of the substance within the package. (TR. 49-51). The Subject Parcel was then transported to the evidence locker of the Valentine Police Department to be stored overnight, despite the package's expected June 8, 2023, delivery date. (TR. 50, 58).

In the early morning of June 9, 2023, PI Ryan and other law enforcement officers "set up" at the Valentine post office to conduct a controlled delivery of the Subject Parcel. (TR. 50). The Subject Parcel was scanned as "receptable full, item oversized," which would alert the recipient that the Subject Parcel would not fit within the mailbox and require the recipient to come to the post office to pick it up. Later that afternoon, Aaron Torres (Defendant's codefendant) and T.T.

---

[6] The drug canine was certified in methamphetamine, cocaine, heroin, and marijuana. (TR. 45; Ex. 1 at p. 7).

[7] The same partial IP address that tracked Package 1 and the Colorado Package also tracked the Subject Parcel on June 9, 2023. (TR 53). However, this was not discovered until after the search warrant was executed and the controlled delivery occurred. (TR 78).

5

arrived at the Valentine post office. Aaron requested the Subject Parcel, and the post office clerk delivered the package to Aaron. Aaron and T.T. left the post office, but were intercepted and detained outside by law enforcement. (TR. 50-51). It was at this time that PI Ryan learned T.T. lived at the Valentine address. (TR. 43, 59).[8]

Because T.T. was a juvenile, law enforcement contacted Defendant to pick him up. (TR. 51). PI Ryan and another investigator met Defendant in the lobby of the city building in Valentine, and Defendant mentioned a package containing a Santa Muerte statue. PI Ryan asked Defendant if she would be willing to talk to him and the other investigator in an interview room, and Defendant agreed. PI Ryan testified Defendant then voluntarily admitted that she knew the Subject Parcel contained methamphetamine; that she was to take the Subject Parcel to a different individual in Kilgore, Nebraska; and that this was the third package she was to receive containing methamphetamine.[9] (TR. 51-52). Based on Defendant's statements, PI Ryan believed Defendant was the actual intended recipient of the Subject Parcel, not T.T. (TR. 55). Defendant also told PI Ryan she had a firearm, which she claimed ownership of, underneath the front passenger seat of the vehicle she arrived in. PI Ryan recovered the firearm, a black semiautomatic handgun which was unloaded, under the driver's seat next to a magazine that was loaded with live ammunition. (TR. 52).

On August 22, 2023, the grand jury returned a two-count indictment against Defendant. (Filing No. 1). Count I charges Defendant and her codefendant with conspiracy to distribute 500 grams or more of a mixture or substances containing methamphetamine. Count II charges Defendant with knowingly being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(l) and 924(a)(8).

Defendant has filed the instant motion to suppress all evidence and statements obtained from the search of the Subject Parcel. (Filing No. 33). Initially, Defendant contends she has standing under the Fourth Amendment to challenge the search of the Subject Parcel because she admitted she was the intended recipient, even though it was addressed to someone else living at her address. (TR. 80). Defendant next argues that the delay of the delivery of the Subject Parcel constitutes a Fourth Amendment seizure, and that PI Ryan did have reasonable suspicion to detain

---

[8] PI Ryan Testified that even if he had discovered this information prior to the application for the search warrant, it would not have negated or changed his belief that the Subject Parcel contained narcotics. (TR. 76).

[9] PI Ryan inferred Defendant was referring to Package 1 and Package 2. (TR. 77).

the Subject Parcel for the canine sniff, or to continue to detain the Subject Parcel while PI Ryan applied for a search warrant. (TR. 84; Filing No. 34 at pp. 3-6). Defendant further asserts that the search warrant on its face was so lacking in probable cause that the good faith exception under *United States v. Leon* should not apply. (TR. 87). Finally, Defendant asserts her statements to law enforcement on June 9, 2023, any evidence seized from her cellular telephone, and the firearm located in the car should be suppressed as fruits of the initial Fourth Amendment violations. (TR. 88).

## ANALYSIS

### I.  Fourth Amendment Standing

Although the parties do not address standing in their briefs, Defendant argued at the evidentiary hearing that she has standing to challenge the search of the Subject Parcel under the Fourth Amendment. Defendant asserts she has standing even though the Subject Parcel was not addressed to her because she claimed she was the intended recipient. The government was "not conceding the issue" of standing and left it for the Court's determination. (TR. 80-82).

"[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171-72 (1969); see also *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015). "An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *United States v. Sierra-Serrano*, 11 F.4th 931, 933 (8th Cir. 2021) (quoting *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017)). "The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." *Id.* (citation omitted).

Defendant compares the instant circumstances to those addressed by the court in *United States v. Terriques*, 211 F. Supp. 2d 1137 (D. Neb. 2002), *aff'd*, 319 F.3d 1051 (8th Cir. 2003). In *Terriques*, law enforcement conducted a controlled delivery of a package bearing a fictious name by delivering it to the defendant's residence as addressed. The defendant accepted delivery of the package at the residence, identifying himself under a fictitious name using a photo identification bearing his fictitious name. *Id.* at 1143-44. Although the defendant had "not admitted or claimed

7

that he owned the package" and his counsel did not make such a claim at the suppression hearing, the court nevertheless found the defendant established Fourth Amendment standing to challenge the search of the package because the evidence showed the defendant used the fictitious name on the package. *Id.*

The circumstances of this case differ from *Terriques* in a couple important respects. First, the Subject Parcel was addressed to "T.T.," who is a real individual who resided at the Valentine address the Subject Parcel was destined for. Thus, unlike *Terriques*, the named recipient on the Subject Parcel was not an alias or another name Defendant used herself. Additionally, T.T. and Defendant's codefendant—not Defendant herself—arrived at the post office to pick up the Subject Parcel after it was scanned as a "receptable full, item oversized" package requiring the recipient to retrieve the package from the post office. Moreover, Defendant claimed that the contents of the Subject Parcel were intended to be distributed to another individual.

Beyond the factual differences, the legal issue in *Terriques* differs from the instant case. *Terriques* addresses whether an individual has Fourth Amendment standing in mail that is addressed to a fictious name. See *Terriques*, 211 F. Supp. 2d at 1143-44. Here, however, there is no fictious name utilized by Defendant with the Subject Parcel. Instead, the Subject Parcel was addressed to a real third party, T.T., who was a resident at the Valentine address. "Courts have held that an individual does not have a legitimate expectation of privacy in mail if he or she is neither the sender nor the recipient listed." See *Roskens v. Graham*, 435 F. Supp. 3d 955, 975 (N.D. Iowa 2020) (finding the defendant did not have a legitimate expectation of privacy in the billing statement because the defendant's name was neither the addressee or the addressor); see also *Murphy v. Morris*, 849 F.2d 1101, 1106 (8th Cir. 1988) (holding a defendant cannot claim a legitimate expectation of privacy in mail that was addressed and sent to another inmate); *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988) (ruling a defendant had no reasonable expectation of privacy in a package addressed and delivered to a third party); *United States v. Givens*, 733 F.2d 339, 342 (4th Cir. 1984) (holding a defendant had no reasonable expectation of privacy in a package that was ultimately intended for the defendant but sent to a third party).

However, Defendant's interactions with the postal contractor and her statements to PI Ryan help support her claim to an expectation of privacy in the Subject Parcel. Previously, Defendant was hand-delivered Package 2, a package that was addressed to "Consuelo Mendoza" who was not associated with the Valentine address, by the postal inspector. In addition, Defendant also

8

received Package 1, a package addressed to "Saul Morales" who was also not associated with the Valentine address. *See United States v. Yodprasit*, No. 19-CR-4088-LTS-KEM, 2020 WL 3120991, at *3 (N.D. Iowa Feb. 12, 2020), *report and recommendation adopted*, No. CR19-4088-LTS, 2020 WL 1076044 (N.D. Iowa Mar. 6, 2020) (finding a subjective expectation of privacy when the defendant, who was receiving the package under a fictious name, had previously picked up packages under the fictious name and claimed an expected arrival time for the package). Moreover, after the delivery of Package 2, Defendant inquired with the postal contractor about another package being delivered to the Valentine address. Defendant also admitted to being the intended recipient of the Subject Parcel and knew that it contained methamphetamine. Although the government is not conceding this issue of standing, PI Ryan testified that he even believed that Defendant was the intended recipient of the Subject Parcel, although it was addressed to T.T. (TR. 55). Therefore, despite the circumstances not being comparable to *Terriques*, the undersigned magistrate judge finds that Defendant has established Fourth Amendment standing to challenge a search or seizure of the Subject Parcel under the Fourth Amendment.

## II.   Reasonable Suspicion for Seizure of the Subject Parcel

Defendant argues that PI Ryan lacked reasonable suspicion both to initially remove the Subject Parcel from the stream of mail to subject it to a canine sniff, and to continue to detain the Subject Parcel pending procurement and execution of a search warrant. (Filing No. 34 at pp. 3-6).

### a. Initial Seizure of the Subject Parcel

Defendant first contends that PI Ryan lacked reasonable suspicion to initially seize the Subject Parcel from the regular stream of commerce. (Filing No. 34 at pp. 3-5).

Fourth Amendment protection against unreasonable searches and seizures extends to packages individuals place in the mail. See *United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999) (citing *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970)). For packages sent by mail, a "[s]eizure occurs when a package is removed from its ordinary progress in the mail and is diverted for further investigation." *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004); see also *United States v. Lakoskey*, 462 F.3d 965, 976 (8th Cir. 2006), *as amended on reh'g* (Oct. 31, 2006) (citing *United States v. Logan*, 362 F.3d 530, 533 (8th Cir. 2004)) (holding a package is seized once it is pulled from the regular stream of mail to subject it to a dog sniff).

A law enforcement officer may only lawfully seize a package for investigative purposes if the officer has a reasonable suspicion the package contains contraband. *Smith*, 383 F.3d at 704. "An officer has reasonable suspicion that a package contains contraband if [the officer] has a particularized and objective basis that is more than inchoate and unparticularized suspicion or hunch." *Lakoskey*, 462 F.3d at 975. "The determination of whether a government agent's suspicion is constitutionally reasonable is exceedingly fact-specific" and requires the court to "examine the totality of the circumstances arguably supporting a determination of reasonable suspicion, evaluating those circumstances as they would be understood by those versed in the field of law enforcement." *Id.* at 976. An officer is allowed to cite in his basis of his suspicion "facts which, alone and to an untrained eye, appear innocuous, but which, to a trained officer familiar with the methods of drug traffickers, are sufficient to establish reasonable suspicion." *Id.* at 975.

The government does not dispute PI Ryan effectuated a Fourth Amendment "seizure" of the Subject Parcel when he removed it from the steam of mail and transported it to the North Platte State Patrol office in North Platte for the canine sniff, but instead contends PI Ryan had reasonable suspicion that the Subject Parcel contained narcotics.[10]

PI Ryan testified his interest in the Subject Parcel arose when he was notified by the mail watch he implemented on the Valentine address. PI Ryan's investigation into Package 1 and Package 2 led to the mail watch on the Valentine address. PI Ryan was made aware of Package 1 when he was contacted by Colorado agents about a Mexico-based partial IP address that tracked the Colorado Package, which contained narcotics. The Colorado agents reported to PI Ryan this same partial IP address tracked Package 1 to be delivered to the Valentine address. Package 1 had suspicious characteristics, such as a fictious return address, the addressed recipient, "Saul Morales," was not associated with the Valentine address, and the package weight was heavier than typical business mailings. PI Ryan's investigation into Package 2 also revealed similar suspicious characteristics, such as a fictious return address, the addressed recipient, "Consuelo Martinez," was not associated with the Valentine address, and the package weighed heavier than Package 1. Both packages were mailed from a source location, Kern County, California. With Package 1's connection to the Colorado package, and the suspicious characteristics of both packages, PI Ryan

---

[10] However, PI Ryan testified that he believes delivery of the Subject Parcel was not delayed by the seizure. (TR 57-58).

suspected the packages sent to the Valentine address contained narcotics, so he implemented the mail watch.

With PI Ryan's interest in the Valentine address, PI Ryan began investigating the Subject Parcel once he received the mail watch notification. PI Ryan testified that, based on his training and experience, the following observations raised his suspicions that the Subject Parcel contained narcotics: (1) the package was a USPS priority mail package; (2) the package originated from the source location of Bakersfield, California; (3) there was a handwritten address information indicating an individual to individual transaction; (4) the package was the same size and shape as the other USPS packages that contained illegal narcotics; (5) the package did not require a signature; (6) the postage for the package was paid in cash; (7) the package was a flat rate mailing box; (8) the named sender of the package was not associated with the return address; and (9) PI Ryan was unable to find the named recipient of the package to be associated with the Valentine address. These factors considered by PI Ryan, in his training and experience, are consistent with the factors the Eighth Circuit has considered when determining reasonable suspicion. See *Smith, 383 F.3d at 704* (finding a handwritten label, sender address from a source state, and a scratched-out return address rising to a reasonable suspicion); see also *United States v. Demoss, 279 F.3d 632, 636 (8th Cir. 2002)* (finding an overnight priority package sent from a source state, a handwritten air bill, a heavy perfume smell associated with the package, excessive taping on the package, the lack of telephone numbers for the sender and recipient, a cash payment taken together in relation to the officer's experience to be a "sufficient basis" for reasonable suspicion to seize the package).

Defendant contends these factors point towards innocent activity, as this "is how every grandmother in America sends gifts." (Filing No. 34 at p. 5). If the mailing characteristics of the Subject Parcel were the only information PI Ryan had, the undersigned magistrate judge agrees it would be a closer call as to whether PI Ryan had the requisite reasonable suspicion to seize the Subject Parcel. See, e.g., *United States v. Vasquez, 213 F.3d 425, 426 (8th Cir. 2000)* (finding the following factors alone did not meet the reasonable suspicion standard: it was a priority package, sent from California, contained a handwritten air bill, had no account number, and there was incorrect address information for the names of the sender and recipient even though they had the same last name).

However, "[e]ven where each factor cited by law enforcement to support a seizure is 'not by itself proof of any illegal conduct and is quite consistent with innocent' activity, the sum of the factors taken together can amount to reasonable suspicion." *United States v. Huerta*, 655 F.3d 806, 809 (8th Cir. 2011) (citation omitted). "Law enforcement officers are entitled to evaluate the totality of the circumstances in deciding whether reasonable suspicion is present, and they may possess reasonable suspicion even when innocent explanations can be put forward for each individual circumstance." *United States v. Reddick*, 910 F.3d 358, 361 (8th Cir. 2018). Here, PI Ryan's observations of the Subject Parcel were made in the context of a larger narcotics investigation. PI Ryan suspected narcotics were being mailed to the Valentine address based on Package 1's connection to the Colorado Package, which contained narcotics, and the suspicious characteristics of both Package 1 and Package 2, so a mail watch was implemented on the Valentine address. PI Ryan testified how his observations of the Subject Parcel take in the totality related to his experience in packages containing narcotics, as well as the information he learned about other packages during his investigation. See *Demoss*, 279 F.3d at 636 (finding the officer had reasonable suspicion because the officer explained how his observations related to his experience in these kinds of investigations). PI Ryan testified specifically based upon his training and experience why the payment of cash, the incorrect address information, the source location of Kern County, California, handwritten labels, the use of a flat rate box, and priority mail are all common techniques he has either been trained or has witnessed with packages containing narcotics. Therefore, the undersigned magistrate finds under the totality of the circumstances, there was reasonable suspicion supporting the initial seizure of the Subject Parcel.

### b. Continued Detention of the Subject Parcel

Defendant further contends that even if the initial detention of the Subject Parcel was supported by reasonable suspicion, any such suspicion dissipated after the drug canine failed to alert to the Subject Parcel. Therefore, Defendant argues the Subject Parcel's continued detention for five or six hours was unreasonable and not supported by reasonable suspicion. (Filing 34 at p. 5). The Eighth Circuit in *United States v. Lakoskey* rejected a similar argument:

> [W]hile a positive alert to a package, by a police canine, may alone be sufficient to establish probable cause to search the package, see, *United States v. Sun[d]by*, 186 F.3d 873, 876 (8th Cir. 1999), the Defendant cites to no authority, nor did our independent inquiry reveal any, for the opposite proposition—namely, that a negative alert dissipates any reasonable suspicion where, as here, several articulable

> factors supported [the officer's] assessment that a reasonable suspicion existed to subject the package to a dog sniff in her presence.

462 F.3d 965, 977 (8th Cir. 2006), *as amended on reh'g* (Oct. 31, 2006) (quoting *United States v. Ramirez*, 342 F.3d 1210, 1212–13 (10th Cir. 2003). The Eighth Circuit found "[t]he factors giving rise to reasonable suspicion in the first place remained unchanged by the positive or negative results of the first sniff test," and that reasonable suspicion even did not dissipate after a second negative dog sniff because the officer explained why the dog may have failed to alert on the package the first time. *Id.*

As discussed above, the undersigned magistrate judge finds PI Ryan had reasonable suspicion to detain the Subject Parcel for further investigation, including to deploy a drug canine to subject the Subject Parcel to a dog sniff. Trooper McKain advised that the canine, who was certified and trained to detect methamphetamine, cocaine, heroin, and marijuana, did not alert the Subject Parcel. PI Ryan testified that based on his experience, the canine's failure to alert to the Subject Parcel did not negate his suspicions. Specifically, PI Ryan testified it was possible the person who had mailed the Subject Parcel had masked or effectively concealed the odor of the narcotic inside the package, or the package contained a drug the canine was not certified to detect—for example, fentanyl, which had been recovered from the Colorado package. As set forth in *Lakowskey*, the Eighth Circuit has recognized that without any evidence to prove differently, a negative alert by a canine does not lead to reasonable suspicion vanishing. See *Lakoskey*, 462 F.3d at 976-77. Therefore, the undersigned magistrate judge finds PI Ryan's reasonable suspicion that the Subject Parcel contained narcotics (as outlined in detail above) did not dissipate after the negative alert.

Defendant also contends that the approximately seven hours the Subject Parcel was detained, including the five additional hours after the negative dog alert pending procurement of the search warrant, was unreasonable and unsupported by reasonable suspicion. (Filing No. 34 at p. 5).

Law enforcement may only detain a package for investigation for a reasonable amount of time. *Lakoskey*, 462 F.3d at 977. "[N]o court has set a limit on the amount of time that a package deposited into the USPS Express Mail system may be held where reasonable suspicion that is less than probable cause has been established." *Id.* (quoting *United States v. Gomez*, 312 F.3d 920, 925 (8th Cir. 2002). Instead, the "length of the detention must be considered in light of the amount

13

of time reasonably required for a diligent inspector to complete an investigation into the package being held," which can vary with each case depending on the circumstances. *Gomez*, 312 F.3d at 925 (holding that detention of a package for fifteen hours to procure a search warrant was a reasonable amount of time); *Lakoskey*, 462 F.3d at 977 (finding one day between initial removal of package from the mail stream and when probable cause was established was reasonable); see also *Demoss,* 279 F. 3d 636-37 (holding that a seizure lasting twenty minutes to obtain a canine sniff was reasonable).

Here, the Subject Parcel was taken out of the stream of mail at approximately 9 a.m. on June 8, 2023, to be transported to the North Platte State Patrol Office for a canine sniff. The search warrant was signed at approximately at 4 p.m. that same day. PI Ryan immediately applied for a search warrant after the canine sniff, and executed the warrant the same day shortly after it was authorized. Execution of the warrant revealed that the package contained methamphetamine, and a controlled delivery of the packaged was scheduled for the following morning. Based on PI Ryan's testimony, there was no delay in applying for a search warrant or in the investigation of the Subject Parcel. Under the circumstances, the undersigned magistrate judge finds that the Subject Parcel was not seized for an unreasonable amount of time.

### III. Probable Cause for the Search Warrant and the Good Faith Exception

Defendant argues that PI Ryan's search warrant affidavit was so lacking in indicia of probable cause that it was unreasonable for law enforcement to rely on it because it was based upon "interdiction hunches," such as the canine failing to alert to the Subject Parcel, the postage being paid in cash, and the recipient of the Subject Parcel not being associated with the address. (Filing No. 34 at p. 7).

"A supporting affidavit establishes probable cause to issue a search warrant if it 'sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched.'" *United States v. Lindsey*, 43 F.4th 843, 848 (8th Cir. 2022) (quoting *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017); see also *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) ("Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Search warrant [a]pplications and affidavits should be read with common sense and not in a

grudging, hyper technical fashion." *United States v. Ryan*, 293 F.3d 1059, 1061 (8th Cir. 2002) (quotations and citations omitted). An issuing judge's determination of probable cause "should be paid great deference by reviewing courts." *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010).

Under *United States v. Leon*, 468 U.S. 897 (1984), evidence seized in reliance on a search warrant is not subject to suppression unless: "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 920 (1984). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (quoting *Leon*, 468 U.S. at 922 (1984)). Under *Leon*, evidence seized in reliance on a search warrant is not subject to suppression unless:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702-03 (8th Cir. 2017) (citing *Leon*, 468 U.S. at 923). Only if the officer knew or should have known that the search was unconstitutional under the Fourth Amendment should the evidence be suppressed. See *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021), *reh'g denied* (May 19, 2021).

The policy behind the good faith exception is that "no justification exists to exclude evidence 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (quoting *Leon*, 468 U.S. at 921). "[A]n officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921. Additionally, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.*

Defendant contends that PI Ryan's execution of the warrant was not objectively reasonable because the warrant affidavit was so lacking in indicia of probable cause. (Filing No. 34 at pp. 6-7). "Entirely unreasonable is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words." *United States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003). For instance, in *United States v. Norey*, the defendant argued the affidavit in support of the warrant was so lacking in "indicia of probable cause to search for evidence of drug trafficking" at the defendant's apartment that officer's belief in the existence of probable cause was entirely unreasonable. *United States v. Norey*, 31 F.4th 631, 636 (8th Cir. 2022), *reh'g denied*, No. 21-2406, 2022 WL 13748851 (8th Cir. Oct. 24, 2022). However, the Eighth Circuit found that the officer had "an objectively reasonable belief in the existence of probable cause, and the affidavit contained sufficient indicia of probable cause" based on various considerations. *Id.* First, the court was not presented any evidence that the officer acted in bad faith. *Id.* In addition, the court relied on the fact that the issuing judge found a substantial basis of probable cause which "normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.*; *Leon*, 468 U.S. at 922. Further, the court looked at the officer's independent investigation of the defendant that was not presented to the issuing judge, which taken in the totality demonstrated that the defendant "engaged in a continuous course of drug dealing and resided at the apartment," which was searched in execution of the search warrant. *Norey*, 31 F.4th at 636.

In this case, there was no evidence presented that PI Ryan acted outside of the scope of the search warrant issued. Therefore, penalizing PI Ryan for properly executing a valid search warrant will not deter Fourth Amendment violations. See *id.* Additionally, similar to *Norey*, it is assumed through signing the search warrant, Magistrate Judge Zwart found a substantial basis of probable cause based on PI Ryan's search warrant affidavit. See *Leon*, 468 U.S. at 922. It is not within PI Ryan's duties to "question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 921.

Moreover, the undersigned magistrate judge finds PI Ryan's reliance on the search warrant was not entirely unreasonably because the search warrant was not so lacking in indicia of probable cause. PI Ryan executed a nine-page search warrant affidavit. The search warrant affidavit included not only his observations and investigation of the Subject Parcel, but also his investigation

into the Colorado Package, Package 1, and Package 2. PI Ryan included specific details regarding how the characteristics of the packages in connection with his experience and training were significant in investigating packages containing narcotics. PI Ryan also included the interview with the postal contractor and the Valentine Police Department detailing Defendant's two interactions in picking up suspicious packages addressed to the Valentine address. Additionally, PI Ryan disclosed his findings of Defendant's criminal history of felony drug offenses. Importantly, PI Ryan further disclosed that the canine sniff did not result in a positive alert. With all this considered, the search warrant cannot be considered "entirely unreasonable" to be relied on for being so lacking indicia of probable cause. Similar to *Norey*, PI Ryan's description of his investigation that was included in the search warrant affidavit showed a fair probability of a continued course of packages suspected of containing narcotics being associated with the Valentine address. Therefore, the search warrant was not so lacking in indicia of probable cause so the officer's reliance on the search warrant was not entirely unreasonable. The undersigned magistrate finds the officer's good-faith reliance on the warrant was objectively reasonable.

### IV.     Fruit of the Poisonous Tree

Defendant argues that her statements to during her interview on June 9, 2023, her evidence seized from her cell phone, and the firearm in her car should be suppressed as fruits of the original unlawful search and seizure of the Subject Parcel. See *Wong Sun v. United States*, 371 U.S. 471 (1963). Because the undersigned magistrate judge finds no Fourth Amendment violations occurred in the seizure and search of the Subject Parcel pursuant to a valid warrant, there is no basis upon which to suppress such evidence and statements. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter, Jr., Chief United States District Court Judge, that Motion to Suppress Evidence and Statements and Request for Hearing (Filing No. 33) be denied.

Dated this 18th day of March, 2024.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.